Good morning, Your Honor. Stephen Newton on behalf of the Appellant Federal Insurance Company. I'd like to reserve five minutes of my time, if I could, for a rebuttal. The District Court decision in this case, as far as we can tell, is the first case in recorded U.S. law which permits retroactive reimbursement of defense costs to a carrier insurer, St. Paul, under the very same policy in which it was found to have a duty to defend. We can't find a case like this in the United States anywhere, and I think that that fact is a good starting point to see that this is a strong marker that there is really something wrong with the District Court decision as it was determined. Essentially, what was teed up in front of the District Court was Federal's motion for a partial summary judgment saying that Federal was entitled to reimbursement from St. Paul for its portion of the settlement in the main case. And the issue was whether or not St. Paul could legitimately withdraw from its defense of Cirrus under its CGL in 2004, after it had been defending for about a year and a half under that CGL, whether it could do that at that point in time solely because of its application of the impaired property exclusion. And we were saying, you can't do that. St. Paul came back with its cross motion saying, yes, we can. And so what was in front of the Court was whether or not it was proper for St. Paul to withdraw. And if the Court found that it was proper for St. Paul to withdraw, then at that point in time we would get one result. But another aspect of the case was we would look at whether or not there was any kind of property damage that was sustained or alleged by Fujitsu, which would totally defeat the application of the impaired property exclusion anyway because it wouldn't apply. The Court went in a different direction, and this was not really briefed or argued. The Court said, well, we're going to go back and take a look at whether St. Paul in fact had a duty to defend, going all the way back to day one, and we're going to start there instead. So what the Court's decision did was it nullified St. Paul's formal coverage position in which it decided to go ahead and defend Cirrus under that CGL policy. And when St. Paul did that in 2002, it noted one of the reasons being the Anthem decision, which was decided by this Court. And I will tell you, I was the attorney for federal in the Anthem decision, having lost that decision there and then losing again on what I consider to be the very same facts in this particular case on identical issues. So we get St. Paul coming in and saying, yes, we will defend you now because we originally said we would defend you only under the technology E&O portion of this policy and not under the CGL. We're going to change that. And furthermore, not only are we going to change it and give you the defense under the CGL, but we're going to make it retroactive all the way back to day one. That's the setting that we were in, and that's what we thought we were dealing with. What we found with the Court's order was something entirely different. The Court said we're going to go back and determine whether they had a duty to defend under the CGL prior to the filing of the second amended complaint. And I think that no one can, with a straight face, argue that that second amended complaint didn't trigger a duty to defend despite St. Paul's current aspects or efforts to characterize it as being oblique or something of that nature. However, so we have a process issue here to begin with. We're saying that we didn't really have a chance to brief this, argue it, turn it upside down, inside out, as we would normally do. We were taken by surprise. And I might also add that the very, very first time that St. Paul attempted to justify that there was no duty to defend under the CGL prior to the filing of the second amended complaint is in its answering brief in front of this Court. It never made that argument to the district court. Can you just say kind of simply what the issue is that you think we have in front of us? Your Honor, I would say this. Because it's de novo review, we're asking the Court to reverse the Court's decision on a couple of bases. One, we believe that that first amended complaint, excuse me, we believe that the original complaint and the complaints filed before the second amended complaint, in fact, triggered a duty to defend under the CGL policy. And we're asking this Court to make that finding. And for all the reasons that we set forth in our brief, as well as the parts of the record that we set forth, we're also asking this Court to determine that, in fact, the impaired property exclusion did not apply and could not apply, again, for the reasons that are set forth in the briefs. And with those two requests, which we think we have shown a basis for that, it then gets us into, well, what does this Court then do with the case, assuming it makes those findings? And in our opening brief, we asked the Court to send the case back to the district court for a computation of damages and handling by the district court that would be consistent with the instructions from this court. In our reply brief, we went a bit further, and we said, well, now that we've thought this through a little bit more and we've seen St. Paul's answering brief, we expanded our request, and we said we would like to have everything that we requested in our opening brief. But we believe that, again, due to de novo review and what has been shown to the Court, this Court has the power and authority to actually terminate the case and terminate it in our client's favor and actually enter the award of judgment in favor of our client. And so those are the main issues, and that's what we're asking this Court to do. That award would be $6.5 million. And I might also add that when the district court judge made his decisions and then we filed a motion for reconsideration saying, well, wait a minute, Judge, what happened here? We went in an unexpected direction. We had a conference with the judge, and basically we discussed this at length, and it was determined it was the rule of the case. And so any trial after that would be on matters that really were of no consequence other than damages, so we agreed to stipulate to what those amounts were, and that's in the record. All the process stuff is really good, but it seems to me that perhaps the most forceful argument that this Court may use is that there is evidence that there was evidence before it showing that the short circuits were the result of corrosion that took place over a long period of time and amounted to progressive deterioration that can't be an accident or an accidental or unexpected sudden event as required in California. Can you focus on that? Yes, Your Honor, thank you. In my view, that is absolutely misdirected, and it's misdirected because the focus should not be on the process by which a product fails. The focus, per the language in the exclusion, is damage to the chip, which is sudden and accidental. There's no dispute that it's accidental. So the question and sole question is whether or not the damage to the chip is sudden, not the process by which it happened. You know, we have the Golden Gate Bridge, the Bay Bridge. They're constantly painted. They're corroding because of the salt sea air, and does that mean that because they're corroding slowly that they've failed? No. Those bridges are serviceable. They keep working. Well, here we had the situation in which the chips may have had this migration due to the red phosphorus, which permitted some corrosion to occur, and then we have a sudden short-circuit failure where the chip does not operate anymore. And the language of the exclusion, if you look at the language, is the damage to the chip that must be sudden, not the process. And I can't emphasize enough that in the St. Paul policy, which is a contract, they have a precise example of the shaft on a motor breaking, and it's explained to us in short, you know, this is what would happen if this shaft breaks. Are you going to be covered for damages? There is not one bit of discussion in that example in the policy about what caused the shaft to break. So, for example, if there were minute cracks in that shaft due to improper welding, something of that nature, you might not have coverage. They don't say that. They say the shaft breaks, suddenly you have coverage. It shouldn't be any different in this case than it is in their precise example given in their own policy. And so when we get into it. Isn't your argument bettered by this difference in the duty to defend and the duty to pay? I mean, isn't your argument bettered by that? I mean, you're really arguing the facts. But in this particular situation, it seems to me that the duty to defend in California suggests, even if the facts are in dispute, they have a duty. I'm only saying that because I've noted where you're going, but I'm trying to understand. And I really appreciate that comment. It's often that we forget about this when we talk about this, but the context is whether the facts are admitted or disputed doesn't really matter. The duty to defend is extremely broad under California law, under the Scottsdale case. And so if there's any potential for coverage, any possibility, and we gave examples in our briefs about situations in which there was a sudden failure based on a short process. They took hair dryers and applied them to the chips in a laboratory, and we had, boom, a failure. So, yes, the duty to defend standard is broad. You have to judge it at the outset of the case. St. Paul, by its own coverage letter, and if you take a look at this, this is very clear in their own coverage letter going back to 2002. It's in the record at 386 and 390. They called this damage to the Fujitsu drives in two places. Again, I think there is plenty of admissions by St. Paul that they had a duty to defend and that it was only when they ascertained that this case was going to be a monster that they decided let's put it over in the E&O case because there the defense limits, the defense expenses reduced the limits of the policy. So, Your Honor, I would like to reserve some time if I could for it. Thank you. Mr. Olson. Good morning, Your Honors. May it please the Court, I'm Robert Olson on behalf of St. Paul Fire and Marine. Mr. Olson, why isn't the example that's used in the policy with regard to the motor almost dispositive of this issue? It doesn't care about the process. It could be stress corrosion cracking. It could be. Oh, it does care. I think it does care about the process. I think part of the problem with the example is I understand it's the example in our policy, but they only quote the first half of the example. The example is not addressing the issue of whether it's sudden or not sudden. If you read the full example, what it's really addressing is whether the product was put in operation or not put in operation. That's the distinction that the example draws, and that's what the example is directed towards. You'll note, too, that the example says it breaks after a few days, suggesting something that is sudden. The example assumes a sudden breakage to address what it really wants to address, which is the distinction between a product that's been put in use and a product that's not been put in use. They only quote the first half of the example. You've got to read the whole – I believe one has to read the whole example. It seems to me that they're trying to draw the distinction between the motor breaking and then the subsequent loss of use of the conveyor. But the next sentence – let me pull it up so I read it directly. What the example reads – this is on 278 of the ER. What it reads is you supply an electric motor. The motor shaft breaks several days later while operating the conveyor. The conveyor isn't damaged, but your customer wants extra costs. If he sues to recover those costs, we won't apply the exclusion. However, if the customer discovers while hooking up the motor that the motor shaft is broken, we won't protect you. So if it breaks before it's put in, it's not covered. If it breaks after it's put in use, it is covered. The example is directed – and that is directly addressing the part of the exclusion at the bottom of the prior column where it says sudden physical damage to your products after they've been put to their intended use. The example is addressed to being put to their intended use and presumes that the break is sudden. The sudden component here, we're talking about 2,000 hours of use time, not several days, which is the example there. How exactly how come is it that your position has to be there is no possibility of coverage from an allegation that says that the chips would unpredictably short-circuit after being put to their intended use? I think that's a little – I think that's a little – I think that's not entirely the case. Because I think – and this is what California law is. This is what the circuits law is in Sony following the Hurley decision and the Gunderson decision in California. It is the insurer's obligation to make some initial showing that there is a factual controversy that would be covered. You just have to show there's a possibility. No, no. You cannot – one cannot speculate. Who's speculating? They're speculating as to how this – as to how the chips – as to the process by which the chips fail. Doesn't Scottsdale really put that burden on the insurer? So it's only in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence. The insurer does not have a duty to defend in that situation. There are two types of possible in insurance coverage analysis under California law. And Sony – this Court's precedent follows this distinction. Sony's decided after Scottsdale there are two types of possible. There is – there's a given set of facts. What sort of legal theories are possible to arise out of those given set of facts? California law is clear, and this is what Scottsdale is referring to, that every legal theory that can arise out of a given set of facts will potentially – will trigger coverage. And, in fact, the insurer must negate all facts suggesting the potential coverage. Must negate all possible theories arising out of those facts. There is a set – there is the second scenario, which is that there's an alleged set of facts and there are some other possible facts that are not alleged, and by alleged I include available through extrinsic evidence, some possible facts that are not alleged that might be alleged in these sorts of situations or might not be. And California law is clear, and this Circuit's precedent is clear in both Sony and Upper Deck, that a carrier and a court is not to speculate about what those possible facts that are not alleged but could be alleged might be, and there is no duty to defend based on what those possible other factual details might be. Okay. Why is it in your view that one possible reason for the physical defect, an unpredictably short circuit, is sudden and unexpected physical injury to the chip? I mean, what's the possible reason? Because it's the – it is the insurer's initial burden, and both Sony and Footnote 8 and Anthem say this. It is the insurer's initial burden to establish that there in fact is some sort of factual controversy as to that. The insurer – Where does the factual controversy come into it? I mean, we're not on, you know, in a summary judgment proceeding. What we're looking at is to see whether the duty to defend, which is maybe in your view outrageously broad in California, but it is quite broad, is triggered by an allegation of a short circuit after the product is put to its intended use that renders the drive inoperable. Why is it that that allegation can't possibly trigger coverage? Because the – because with the exception to an exclusion here, it is the insurer's burden to show that some covered fact is in controversy. And although California duty to defend is broad, it is not unlimited. Numerous cases, California cases, say that. And if – if – Can you humor me? Absolutely. Just answer the question, okay? Why is it that the allegation that shifts with unpredictably short circuit after being put to their intended purpose, thereby rendering the drive inoperable, why is it that that allegation cannot trigger coverage? Because there is no factual allegation, no extrinsic evidence, that the chips failed because of sudden injury to them, sudden damage to the chips themselves. So you're suggesting under California law, the insured has to suggest to you more than the fact that there's a potential for coverage? More than the fact that there are – that there is additional factual detail that could be alleged and, if alleged, would trigger coverage. And which case do you rely on for that? I rely on this Court's precedent in Sony. I looked at Sony. I don't see it. I look at – I rely on Gunderson. I rely on Hurley. I rely on Monticello. Okay. But my worry is that if I look at Scottsdale and try to put all of those cases on the fact that the insured's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage, I'm having a tough time with Judge Reimer's question and your answer. And the problem is that – and, again, Sony and footnote 8 and anthem say this. The insured has to make an initial showing. It's not a large showing. It's not a high hurdle. But the insured has to make an initial showing that there is some factual basis that the damage to the insured's product, in fact, was sudden physical damage to the insured's product. They had – the insured had two and a half, three years to say, here's a report, here's anything. So as long as this – as long as the failure, ultimate failure, though it be sudden, was a result of a process, then this provision doesn't apply. Yes. In preparing for this argument, I picked up a TV control, and it stopped working. And it stopped working instantaneously. I opened it up, and guess what? I had a little AA battery that was corroded there. And because I was preparing for this oral argument, I said, aha, this is not sudden damage to the insured's product if the product is the battery. It was corrosion. It happened – you know, the failure may have been more point of time, but the damage to the product was not sudden. And the exclusion doesn't say a sudden and accidental failure of the product. The exclusion says sudden – it says sudden physical damage to your product. There's no doubt that the growth, the electrical component, the metal growth in these chips was not sudden. It was a progressive – a progressive process. And so the exclusion does not apply to that. But my problem is that, again, you are arguing facts. And I don't have it on a fact basis. I have it on a duty to defend basis. We're not talking about whether you've got to pay here. We're talking about whether there is something come up in this suggested claim to you that is not – that you have a duty to defend until you can negate all the facts of the potential coverage. Let me try – If you have any way for this to have happened based on the facts that you have in there, that will come from this sudden event, then it seems to me until you can extinguish that, you've got a duty to defend. Let me try coming at this another way. I have an employee, John Smith. My – I have a business auto policy that covers any accident by my employees in the course and scope of their business. There's a complaint that says John Smith was involved in an auto accident. Maybe it was on a Wednesday. Maybe it was on a Saturday. That complaint, is it possible that John Smith was acting within the course and scope of his duties as my employee at the time? Yeah, it's possible he was. It's possible he was acting in his own personal capacity. The carrier there, under California law, does not owe a duty to defend. Even though a bare complaint that said John Smith caused an auto accident, possibly he could have been in the course of – Have you ever won a case on that? Certainly – certainly the carrier in Sony won the case on that. Certainly it was – In part because there was no – there was no damage to the – No, because – because there – because the – because the insured has the initial burden of showing that the – that the claim at least comes within coverage and when there's an exception to an exclusion. Again, the Sony footnote says that. The insured's burden is to make an initial showing – that's footnote 8 – an initial showing that it comes within the exception to the exclusion. That showing is not a particularly hard one. You know, if I give you an affidavit by John Smith who says, you know, I was – it was a Saturday, but I was driving to work to do some – I was on a work errand, that's – whether the carrier believes it or doesn't believe it, that's enough to trigger the duty to defend. But there has to be some initial, you know, fact that is – that is in controversy that shows – and just because the complaint is agnostic about a necessary trigger of coverage does not trigger a carrier's duty to defend under California law. And Scottsdale has not changed that law. Scottsdale didn't purport to change that law. If you look at the two cases Scottsdale cites, CNA – C-Board says all the facts are alleged in the First Amendment complaint and Gray v. Zurich is where the facts are lesser included. It's whether you could have a negligent intent to assault someone at the same time that you had an intentional one. You – there has to be something. What was missing from the counterclaim? What was missing from – what was missing from the counterclaim – well, two things. What was missing from the counterclaim was any claim that Fujitsu's other external device was physically damaged. And that – and that – That doesn't have anything to do with the – Not with the sudden and accidental. But that's – that was then supplied by the Second Amendment complaint. And what was missing from the counterclaim was that the damage that the failed chips suffered was a sudden damage to those chips. If they said the chips had a sudden or instantaneous damage. And you can't get from the allegation that the chips would unpredictably short-circuit, thereby rendering the drive inoperable. You can't get a possibility that the chip just. That's a – that gives you a – gives one a – it's an equipose. It doesn't tell you whether it does or whether it doesn't. And the insurance burden is to show something that it was, in fact, sudden. If you're right about that, the Second Amendment complaint wouldn't have triggered a duty to defend, would it? Not under the sudden part. It triggered the duty to defend because it – because it – because it alleged injury to Fujitsu's property. That – and that's – and that's what the district court found. And we agree with that. Okay. Thank you. I see my time is up. Thank you very much. Thank you, Your Honor. I'll be brief. Yes, it is key as to what is the standard for determining a duty to defend. I would note that the duty is measured at the outset of the case. And once that's set, then the insurer has to come in and prove conclusively, with no possibility, that there could not be coverage thereafter. So the question I would pose is this. How can St. Paul say in April of 2004 or today, conclusively, that there was no property damage to the Fujitsu drives or to the circuit boards? How can St. Paul say conclusively that there was no single chip failure that was not sudden? They can't. We have in the record the fact that these drives, and we're talking about hundreds of thousands of drives, were not even tested until late in 2004 by the parties because of all kinds of discovery disputes. So for St. Paul to sit back and say, we are convinced that it's not possible for there to have been a sudden failure of a chip, it's what they want to say. But they can't say it under the standard that applies under California law. They had a duty to defend at the beginning, and they had one all the way through under that CGL policy. And they also noted, and again this is in the record, in some of their letters that they wrote prior to April of 2004 when they withdrew, that we note that the chips have not yet been tested. And yet they're saying conclusively that it's not possible for a chip failure to have been sudden. I would also note that we have two bases here. One is that the original counterclaim in fact alleged consequential property damage or physical injury to tangible property of Fujitsu drives. That's our position. And if that's true, you don't even have to get into the impaired property exclusion because if there's consequential damages, that exclusion just goes off the table. I would note that we have a very small addition in the second amended complaint referring to specifically damage to the printed circuit boards to which the chip was attached and then to the hard drives themselves in which the circuit board was placed. But I need to really emphasize these are the very same chips, the very same printed circuit boards, the very same hard drives either in the first complaint or in the second amended complaint. Nothing changed. They're all the same thing. Second, in that original complaint, there was an allegation that Fujitsu was damaged because it had to repair or replace. Well, I would say repair what? The use of that one word alone, you don't repair something unless it's damaged. And I was talking about its drives. So, you know, what did that word mean? Well, I don't think any insurer could look at that word being used in the original counterclaim when it says Fujitsu incurred damages to repair those drives. I don't think anyone can say with a straight face that that wouldn't give the possibility of physical injury to those drives. Thank you very much, Your Honor. Thank you, counsel. Both of you. The matter just argued will be submitted. Thank you.
judges: Leighton, Rymer, Smith N. R.